# In the United States Court of Federal Claims

No. 18-923C

Filed: July 6, 2021

**TONIA TIPPINS, et al.,**

    *Plaintiffs,*

v.

**THE UNITED STATES,**

    *Defendant.*

*Nathan S. Mammen*, with whom were *Ragan Naresh* and *Emily M. Scott*, Kirkland & Ellis LLP, Washington, D.C., for Plaintiffs.

*Douglas G. Edelschick*, Senior Trial Counsel, with whom were *Marin F. Hockey*, Deputy Director, *Robert E. Kirschman, Jr.*, Director, *Brian M. Boynton*, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., *LCDR Justin R. Jolley*, Deputy Chief, and *Brian Judge*, Chief, Office of Claims & Litigation, U.S. Coast Guard, Of Counsel, for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**[1]

    In this military pay case, several former members of the United States Coast Guard ("USCG" or "Coast Guard") challenge their involuntary retirements as unlawful. Tonia Tippins, Derrik Magnuson, George Holloway, Jennifer Rehberg, Glenda Smithleeth, and M. Allen Bumgardner (collectively, "Plaintiffs") served as enlisted members of the Coast Guard until their respective separations through Career Retention Screening Panels ("CRSPs"). They bring this action seeking corrective action, back pay and related benefits, reinstatement to active service, and a declaratory judgment that the process used to effectuate their retirement was contrary to law. (Am. Compl. at 17, ECF No. 8).

    The question at the heart of this dispute appears simple enough: were the CRSPs lawfully convened as part of a "reduction in force" pursuant to 14 U.S.C. § 357(j)? If they were, the United States is entitled to judgment. If not, the Plaintiffs are entitled to some measure of relief. To answer this question, the Court must determine whether the statute is unambiguous and, if it

---

[1] This case was originally assigned to Senior Judge Loren Smith. (ECF No. 2). On December 3, 2019, this case was transferred to the undersigned. (ECF No. 33).

is not, whether the Coast Guard's application is entitled to deference.

The Court finds the statute is unambiguous and agrees with the Plaintiffs' interpretation of "reduction in force." As the Court will explain below, even if the statute were ambiguous, the Secretary's memoranda authorizing the CRSPs under § 357(j) did not interpret the statute, and thus the Coast Guard would not be entitled to deference. Accordingly, Plaintiffs' Motion for Summary Judgment, (Pls.' Mot., ECF No. 62), is granted, and the United States' Cross-Motion for Summary Judgment, (Def.'s Mot., ECF No. 67), is denied. Finally, the Plaintiffs' Motion to Strike is denied as moot.

## I. Background[2]

Plaintiffs are Coast Guard veterans who each honorably served twenty years or more before being forced to retire by CRSPs conducted between 2013 and 2015. (Am. Compl. ¶¶ 7–12; Answer ¶¶ 7–12, ECF No. 9). While serving in the Coast Guard their occupations varied widely and each received numerous awards for their excellent service. (Am. Compl. ¶¶ 7–12).

The CRSPs were first authorized in 2010 when the Secretary of Homeland Security (the "Secretary") affixed his signature to a memorandum sent by the Commandant of the Coast Guard. On August 13, 2010, the Commandant received approval from the Secretary "to conduct an Active Duty Enlisted Career Retention Screening Panel in the fall of 2010." (Pls.' Mot. Ex. 7 at pp. 8–9).[3] The Commandant had advised the Secretary that the panel was "required to address high retention and its adverse impact on workforce flow[,]" citing the tendency of junior enlisted members to request voluntary separations, while senior members remained with the force. (*Id*.). The Commandant warned that "[i]f allowed to continue, this trend . . . will result in an imbalance in the enlisted workforce's experience level for many years to come." (*Id*.).

Invoking 10 U.S.C. § 1169 and 14 U.S.C. § 357(j), the Secretary authorized CRSPs to review "the records of all first class petty officers and below with twenty or more years of

---

[2] The Court has ordered resolution via summary judgment rather than judgment on the administrative record—the normal means for resolving military pay cases. (Order, ECF No. 22). After detailing the facts relevant to this dispute, the Court will explain why this case proceeds on the path less traveled. Despite the exceptional posture, the United States has filed an Administrative Record containing numerous relevant documents. (AR, ECF No. 58). Although the Court is not conducting a trial on the Administrative Record under RCFC 56.1, the parties stipulated that no material factual issues preclude summary judgment. (Tr. of Oral Arg. at 13–14, 26:13–15, ECF No. 74).

[3] To their Motion for Summary Judgment, Plaintiffs have attached as an exhibit the Administrative Record from *Lippmann v. United States*, 127 Fed. Cl. 238 (2016) (Case No. 15-192, ECF No. 11-1). To avoid confusion between that record and the one the United States has filed in this case, the Court will cite to the PDF pagination as it appears in the Court's blue CM/ECF Bates Stamp in the header of Pls.' MSJ Ex. 7. For example, when referring to the *Lippmann* AR, the Court would cite to the cover page, which simply reads "EXHIBIT 7," as "(Pls.' MSJ Ex. 7 at p. 1)."

service and all chief petty officers and above with twenty or more years of service and three years or more time in grade." (*Id.*). The first of these statutes, 10 U.S.C. § 1169, in relevant part, simply provides that no regular enlisted member of an armed force may be discharged before his or her term of service expires, except as prescribed by the Secretary. When it was in effect, 14 U.S.C § 357[4] governed the involuntary retirement of enlisted members. It provided, in relevant part:

> (j) When the Secretary orders a reduction in force, enlisted personnel may be involuntarily separated from the service without the [Enlisted Personnel] Board's action.

§ 357(j).

Notably, although it cited § 357(j), the 2010 authorization by the Secretary did not mention a "reduction in force" (often abbreviated as a "RIF"). (Pls.' Mot. Ex. 7 at pp. 8–9; *see also* AR 27 ("Section 357(j) does not define 'reduction in force,' directly or by reference, and the 2010 CRSP avoided that expression in describing the process to the fleet.")). In fact, the Office of Military Personnel, a component of the Coast Guard administrative hierarchy, was messaging to the rank-and-file servicemembers that the 2010 process was "not a RIF and we need to ensure that it is not associated with a RIF." (Pls.' Mot. Ex. 9). This message was part of a strategy to "create flow and provide opportunities to [the Coast Guard's] junior workforce[,]" thus the Coast Guard intended to "design[] and message[]" the CRSPs "as a flow stimulating tool and not a RIF." (Pls.' Mot. Ex. 10). Essentially, the Secretary sought to clear out older members to "accelerate advancement of junior enlisted members" and "reinvigorate accession of recruits[.]" (Pls.' Mot. Ex. 11). "[T]he CRSP was not intended to reduce the overall size of the force." (*Id.*; *see also* Pls.' Mot. Ex. 9 ("Body to billet we are doing fine, but upward mobility and flow continues to be a problem and will pose bigger problems down the road.")).

The Secretary similarly authorized CRSPs in 2011–2014. (AR 27, 53, 86, 128). Interestingly, the memoranda authorizing these CRSPs contain slightly varying language regarding § 357(j) and "reduction(s) in force." The 2011 memorandum stated:

> Under Section 357 (j), the Secretary of Homeland Security must provide authorization for involuntary retirements without action by Enlisted Personnel Boards pursuant to a "reduction in force." Section 357(j) does not define "reduction in force," directly or by reference, and the 2010 CRSP avoided that expression in describing the process to the fleet. The Assistant Commandant for Human Resources designed CRSP to strategically rebalance the force toward a more upwardly mobile, performance based demographic.

(AR 27). The 2012 and 2013 memoranda contained the following identical language:

---

[4] Subsection (j) of § 357 was repealed in 2016. Coast Guard Authorization Act of 2015, Pub. L. No. 114-120, § 215, 130 Stat 27, 45–46 (2016).

3

> Under Section 357(j), the Secretary of Homeland Security may authorize involuntary retirements without action by Enlisted Personnel Boards pursuant to a "reduction in force." In order to avoid creating confusion in the fleet, the CRSP process does not include the term "reduction in force," which has specific meanings in other statutory contexts, because title 14 does not define, directly or by reference, "reduction in force."

(AR 53, 86). The 2014 memorandum provided:

> Under Section 357(j), the Secretary of Homeland Security may authorize involuntary retirements without action by Enlisted Personnel Boards pursuant to a "reduction in force." In order to avoid creating confusion in the fleet, the CRSP process does not include the term "reduction in force."

(AR 128).

The 2010 and 2011 CRSPs reviewed the records of all retirement-eligible Coast Guard service members at (1) pay grade E-6 and below with at least twenty years of active military service; and (2) at pay grade E-7 and above with at least twenty years of active military service and three or more years of service at their current pay grades. (AR 17, 32). Servicemembers that had been reviewed in the 2010 CRSP were excluded from the 2011 CRSP. (AR 17, 32). The 2012 CRSP utilized the same selection criteria but did not exclude those previously screened and retained by the 2010 and 2011 CRSPs. (AR 57).

The 2013 CRSP reviewed the records of retirement-eligible service members who were either at pay grade E-6 and below with at least 19.5 years of active military service, or at pay grade E-7 and above with at least 19.5 years of active military service and three or more years of service at their current pay grade that had not been reviewed by the CRSP in the two years prior. (AR 89). The 2014 CRSP reviewed all personnel grade "E-7 and above with 19 or more years of active military service who have three or more [years'] time in grade as of 1 June 2014." (AR 131). Those members reviewed in 2012 or 2013 were excluded from 2014 CRSPs. (AR 132).

Communication between selected members and the CRSPs was limited to a written memorandum with a command signature, without attachments, and less than two pages in length. (AR 18, 33–34, 59, 92, 133). Service members selected for involuntary retirement were permitted to appeal only in circumstances of "material error, newly discovered evidence, or the presence of improper documents" in the member's personnel file. (AR 19, 34, 59, 92, 133).

From 2010 to 2014, the Coast Guard selected a total of 832 service members for involuntary retirement. (Pls.' Mot. Ex. 12 at 8). At the end of fiscal year 2014, "the number of actual enlisted service members (31,126) had dropped to more than 1,000 below the authorized number of enlisted billets (32,368)." (*Id*. at 9). Accordingly, "the Coast Guard decided that it was not necessary to hold another CRSP in 2015." (*Id*. (citing AR 164–65)). Throughout this multi-year process, the Coast Guard "generally did not eliminate the billets that were occupied by the enlisted service members in higher grades (E-7 and above) who were selected for involuntary retirement" but did reduce numbers of enlisted billets for grades E-6 and below. (*Id*. at 9–10). Notably, the Coast Guard did not eliminate the billets Plaintiffs held prior to their involuntary

4

retirement. (Pls.' Mot. Ex. 8 at 7–8). From 2009 to the end of 2015, the Coast Guard reduced its total number of authorized enlisted billets from 33,550 to 31,990, with each year logging a decline from the previous year. (Pls.' Mot. Ex. 12 at 7–10).

In July 2018, three plaintiffs brought this action on behalf of themselves and a class of service members retired using the 2012–2014 CRSPs. (Compl., ECF No. 1). Several months later, Plaintiffs filed an Amended Complaint, adding three additional service members. (Am. Compl. at 1). Plaintiffs never sought to certify a class under RCFC 23.

In July 2019, the Court determined that this action should proceed on motions for summary judgment under RCFC 56 rather than motions for judgment on the Administrative Record under RCFC 52.1(b). (Order, ECF No. 22); *supra* n.1. The Court reasoned that because Plaintiffs were "challenging the legality of the CRSPs for the first time, and neither the Coast Guard nor a military corrections board has considered this issue, there is no appropriate administrative record for the Court to review" and thus *de novo* review is the appropriate standard. (*Id*. (citing *Lippmann*, 127 Fed. Cl. 238)).[5] Thereafter, the Court permitted limited discovery regarding the Coast Guard's interpretation of "reduction in force" in the context of 14 U.S.C. § 357(j). (Disc. Opinion at 6–7, ECF No. 52).

That limited discovery period now being closed, the parties submit the case on cross-motions for summary judgment. The United States attached an appendix to its Cross-Motion, (Def.'s Appendix ("DA"), ECF No. 67-1), which contains a "Declaration of Captain Christopher P. Calhoun" who served as Chief in the Office of Military Personnel and authored several of the messaging emails described above. (DA 61–63). Plaintiffs, in their Reply and Opposition, move to strike this document. (Pls.' Reply at 14, ECF No. 69). The Court will address those issues in turn.

## II. Analysis

The parties present the Court with a "*Chevron*" issue. In *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), the Supreme Court held that when a court reviews an agency's construction of a statute the agency administers, the court must answer two questions. First, the reviewing court must determine whether Congress has spoken to the precise question at issue—that is, whether the statute is ambiguous or unambiguous. *Id*. at 843. If Congress has clearly spoken—i.e., the court determines that the statute is unambiguous—the Court must give effect to Congress's plain words expressing its intent. *Id*. If Congress has not clearly spoken—i.e., the Court finds that the statute is ambiguous—the Court looks to the agency's interpretation and asks whether that interpretation is reasonable. *Id*. If the agency's interpretation is reasonable, the Court must afford the deference to the agency's construction. *Id*.

---

[5] Although the United States believes this case should have proceeded to judgment on the Administrative Record rather than summary judgment, because there are no disputed issues of material fact, the United States now acknowledges it no longer matters. (Tr. of Oral Arg. at 29–31).

at 844. But if the agency has not offered an administrative interpretation of the statute, then the Court must "impose its own construction on the statute[.]" *Chevron*, 467 U.S. at 843.

Here, the Court concludes that § 357(j) is unambiguous: a "reduction in force" is the elimination of positions or jobs, not merely the separation of personnel. The Court's conclusion differs from the interpretation the Coast Guard offers in its briefs. But the Court owes no deference to that interpretation because it is merely the Coast Guard's convenient litigating position, not based on any meaningful agency interpretive process. Therefore, even if the Court were to determine that § 357(j) was ambiguous, then the Court would be required to "impose its own construction on the statute[.]" That construction would lead the Court to the same conclusion: the Coast Guard's involuntary retirement of Plaintiffs through CRSPs was not part of a "reduction in force" under § 357(j) and thus was contrary to law.

The parties agree that there are no genuinely disputed issues of material fact. (Tr. of Oral Arg. at 26:13–15). And statutory interpretation is purely a matter of law. *Deutsche Bank AG v. United States*, 742 F.3d 1378, 1381 (Fed. Cir. 2014). Therefore, under RCFC 56 and for the reasons that follow, Plaintiffs are entitled to summary judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

### A. *14 U.S.C. § 357(j) is unambiguous.*

As an initial matter, it is helpful to orient Subsection (j) and the phrase at issue within the context of the entire statute. Title 14 Section 357 of the U.S. Code governed the involuntary retirement of Coast Guard members until its repeal in 2016. *Supra* n.4. Section 357(a) provided that "Enlisted Personnel Boards shall be convened as the Commandant may prescribe to review the records of enlisted members who have twenty or more years of active military service." Subsection (b) prescribed two instances where an Enlisted Personnel Board could review enlisted members and recommend their involuntary retirement to the Commandant: (1) the servicemember's performance was unsatisfactory; or (2) professional dereliction. § 357(b). Subsections (c)–(h) described the procedure for that review process, the makeup of the review Board, procedure for appeal, timing of separation, and entitlement to retired pay. Subsection (i) described the retired pay increase owed upon separation to enlisted members cited for extraordinary heroism in the line of duty. Finally, Subsection (j) announced an exception to the statute's otherwise detailed procedures for involuntary retirements: "[w]hen the Secretary orders a reduction in force, enlisted personnel may be involuntarily separated from the service without the Board's action." § 357(j).

There is no dispute that the CRSPs were not Enlisted Personnel Boards formed under 14 U.S.C. § 357(a)–(g). (Def.'s Mot. at 2). Therefore, Plaintiffs' involuntary retirements through the CRSPs were only lawful if they were part of a "reduction in force" ordered by the Secretary of Homeland Security under § 357(j). This case turns on the meaning of those three words.

The United States argues that Congress intended to assign "reduction in force" a "flexible" definition depending on the circumstances in which § 357(j) was invoked, and the phrase can therefore be read to mean "a reduction in personnel, a reduction in positions, or both." (Def.'s Mot. at 12). Plaintiffs counter that "reduction in force" has a clear meaning: "a reduction in the size of the force—that is, the elimination of positions or jobs—not termination of

individual members or employees." (Pls.' Reply at 5). The Court agrees with Plaintiffs and holds that a "reduction in force" is the elimination of positions or jobs, not merely the separation of personnel.

"In determining the meaning of a statutory provision, [courts must] look first to its language, giving the words used their ordinary meaning." *Artis v. D.C.*, __ U.S. __, 138 S. Ct. 594, 603 (2018) (internal quotations omitted). "[W]hen Congress uses the same language in two statutes having similar purposes, . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Romag Fasteners, Inc. v. Fossil, Inc.*, 866 F.3d 1330, 1335 (Fed. Cir. 2017) (quoting *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) (internal quotation marks omitted)). Although interpretation of the "reduction in force" clause in § 357(j) is an issue of first impression, the Federal Circuit has defined "reduction in force" in other circumstances. In the context of civil service employees, "[a reduction in force] is an administrative procedure by which agencies *eliminate jobs* and reassign or separate employees who occupied the abolished positions." *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002) (emphasis added). "A RIF is not an adverse action against a particular employee, but *is directed solely at a position within an agency*." *Id*. (emphasis added); *see also Huber v. Merit Sys. Prot. Bd.*, 793 F.2d 284, 286 (Fed. Cir. 1986). The Federal Circuit has made clear that a "reduction in force" necessarily involves the elimination of positions as a prerequisite. *Gandola v. F.T.C.*, 773 F.2d 308, 310 (Fed. Cir. 1985) ("A reduction in force involves two steps. First, the agency determines which positions to abolish. Second, it selects the people to be eliminated serving in those positions on the basis of their retention standing."). And while the elimination of positions indubitably might involve the separation of personnel who occupy those eliminated positions, the agency cannot target specific personnel and then decide to eliminate their positions under the guise of a reduction in force. *Id*. at 312. ("A reduction in force may not be used as a disguised adverse action to remove or demote a particular employee."); *Huber*, 793 F.2d at 286 ("A RIF is an administrative procedure by which agencies eliminate jobs and account for employees who occupied abolished positions.").

Other Courts have interpreted "reduction in force," albeit in the context of statutes governing civilian workforce protections. In *Barnes v. GenCorp Inc.*, 896 F.2d 1457 (6th Cir. 1990), the court considered an age discrimination case brought under the Age Discrimination in Employment Act. There, the court interpreted "reduction in force" to mean the "elimin[ation] of one or more positions[,]" not a situation where the employee "is replaced after his or her discharge." *Id*. at 1465. Critically, the *Barnes* court clarified that "a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Id*. Therefore, a reduction in force can occur where the employer eliminates positions and redistributes responsibilities to remaining employees without replacing the eliminated personnel. *Id*. ("A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties."); *see also Sanders v. Kohler Co.*, 641 F.3d 290, 294 (8th Cir. 2011) ("When a company fires one worker and replaces him with another, there is no net loss in the number of employees and no 'reduction in force' as the term is commonly understood.").

In support of its position that Congress intended to assign a flexible definition to the phrase "reduction in force," the United States cites *Cross v. Dep't of Transp.*, 127 F.3d 1443 (Fed. Cir. 1997), *Nat'l Fed'n of Fed. Emps., Loc. 1442 v. Dep't of the Army*, 810 F.3d 1272 (Fed.

Cir. 2015) ("*NFFE, Local 1442*") and *Welch v. Dep't of Army*, 323 F.3d 1042 (Fed. Cir. 2003). However, those cases do not support the broad definition the United States urges the Court to adopt.

In *Cross*, the Federal Circuit examined employment actions surrounding Congress' dissolution of the Interstate Commerce Commission ("ICC"). *Cross*, 127 F.3d at 1445. The ICC was abolished by an act of Congress in 1996 and many of its functions were absorbed by its successor agency, the Surface Transportation Board ("STB"), as well as the Federal Highway Administration within the Department of Transportation. *Id*. In the summer of 1995, while Congress was debating legislation to abolish the ICC, officials within that agency began discussing which functions and positions would be transferred to the STB and the Federal Highway Administration. *Id*. Later the same year, the ICC began to notify employees that the agency would conduct a reduction in force, during which employees "identified as holding positions within the identified functions" would be transferred out of the ICC and into the appropriate agency (STB or the Federal Highway Administration) while those without a surviving function would be separated. *Id*. at 1446. Even before the RIF was announced, it was obvious that all positions within the ICC were to be eliminated, but the *Cross* plaintiffs challenged the RIF on the grounds that, until the law abolishing the ICC was enacted, there was no "lack of funding" that justified the RIF. *Id*. However, the Federal Circuit disagreed, holding that a RIF conducted pursuant to an anticipated shortage of funding was lawful. *Cross*, 127 F.3d at 1447. *Cross* is largely inapplicable to this case, but in recognizing an agency's discretion to conduct a RIF, the Circuit cited *Grier v. Department of Health and Human Servs.*, 750 F.2d 944, 945–46 (Fed. Cir. 1984). Significantly, the *Cross* court summarized its understanding of *Grier*'s holding in a parenthetical: "*a RIF* is not aimed at removing particular individuals, but *is directed solely at positions*." *Cross*, 127 F.3d at 1447 (emphasis added). The Circuit's interpretation of its own case law, focusing on positions rather than individuals, supports Plaintiffs' reading of 14 U.S.C. § 357(j) and contradicts the definition offered by the United States.

The United States cites *NFFE, Local 1442* for the proposition that "a reduction in force may involve a reduction in personnel without a reduction in positions, if, for example, an agency furloughs personnel, or, as in this case, the military needs to ensure the proper functioning of the workforce by reducing personnel without reducing positions[.]" (Def.'s Mot. at 13 (citing *NFFE, Local 1442*, 810 F.3d 1272)). However, *NFFE, Local 1442* does not support that proposition and did not involve or interpret a statutory "reduction in force." In *NFFE, Local 1442*, the plaintiff, a federal workers union comprised of civilian employees at the Letterkenny Army Depot, appealed the workers' six-day furloughs. *NFFE, Local 1442*, 810 F.3d at 1273. "The furloughs were the result of an automatic process of federal agency spending reductions known as 'sequestration.'" *Id*. The furloughs were conducted pursuant to Title 5, chapter 75 of the U.S. Code, which pertains to the organization of the Federal Government and its employees. 5 U.S.C. § 7501 *et seq*.; *see also NFFE, Local 1442*, 810 F.3.d at 1277 (discussing various provisions of that title applicable to adverse actions against unionized employees). The unionized workers challenged the adverse action against them under § 7512, which *specifically* "does not apply to . . . a reduction-in-force action[.]" 5 U.S.C. § 7512. *NFFE, Local 1442* simply has no application to this case.

In *Welch*, the plaintiff, an Army Corps of Engineers employee, appealed his involuntary separation from the Corps through a single-position RIF. *Welch*, 323 F.3d at 1044. John Welch,

the plaintiff, was one of five Information Management Officers within the Corps district area. *Id*. One of those positions was GS-14, while the rest (including Welch's) were GS-13. *Id*. After conducting a "consistency review," the Corps recommended that Welch report to the Deputy Commander, rather than to a Special Assistant. *Id*. After his realignment, the Corps adopted a new position description for the district's GS-14 Information Management Officer and announced a vacancy for which Welch applied and was not selected. *Welch*, 323 F.3d at 1044. Afterward, the Corps conducted a RIF and eliminated his GS-13 position, then reassigned Welch to a GS-12 position with a different title. *Id*. Welch appealed to the Merit Systems Protections Board and his claim was denied. *Id*. The Circuit upheld that denial, observing that "[a]lthough a reduction-in-force frequently involves a reduction in the number of employees, it need not do so. *If a position is eliminated* for a proper managerial reason, *that will justify a reduction-in-force*." *Id*. at 1046 (emphasis added). Importantly, in *Welch*, the agency *eliminated positions* as part of the reduction in force.

As the Plaintiffs point out, *Welch* does not support the United States' flexible reading of "reduction in force" because the holding in *Welch* relied on the agency's elimination of positions. Here, the vacated positions were not eliminated, but rather opened to promote junior servicemembers. As the United States admitted, "[w]hen the Secretary of Homeland Security ordered reductions in force in [2010–2014], . . . the Secretary did not separately and specifically order the elimination of particular billets (or positions) in the Coast Guard." (Pls.' Mot. Ex. 12 (Interrogatory Responses) at 11). And Plaintiffs' positions (or "billets") were not eliminated after Plaintiffs were involuntarily retired. (Def.'s Admissions, Pls.' Mot. Ex. 8 at 7–8). As the Sixth Circuit articulated in *Barnes*, "[a]n employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge." *Barnes*, 896 F.2d at 1465.

Moreover, the Coast Guard's public messaging campaign around the CRSPs sharply undercuts the United States' argument that the involuntary retirements were actually a reduction in force. Under orders from the Assistant Commandant for Human Resources (Rear Admiral Neptun), Captain Calhoun—the Chief of Military Personnel—made clear that he understood the CRSPs were "not a RIF and [the Coast Guard] need[ed] to ensure that [the CRSPs were] not associated with a RIF." (Tr. of Oral Arg. at 39:6–23; Pls.' Mot. Ex. 9).[6] This messaging campaign reflected the reality that if the Coast Guard described the CRSPs as part of a RIF, it would have been misleading "because the CRSP was not intended to reduce the overall size of the force." (Pls.' Mot. Ex. 11). The Coast Guard has since admitted that it never informed its members that it considered the CRSPs to be part of a reduction in force. (Def.'s Admissions at 6–7).

Finally, the United States argues that review of Coast Guard personnel actions is beyond the Court's purview. (Def.'s Mot. at 13–14) (arguing that "Congress did not establish any 'test or standard' that would constrain the Secretary's exercise of military discretion[,]" thus the Court

---

[6] On January 28, 2021, Captain Calhoun signed an affidavit declaring that his email exchanges included as Plaintiffs' Exhibits 9–11 & 14 reflected a "communications strategy," that he did not have legal or policymaking authority. (DA 61–63). That is the context in which the Court places Captain Calhoun's contemporaneous emails, and his current statements prepared for the purposes of this litigation do not contradict his previous statements.

must abstain from judicial review). The United States appears to base this argument on the "necessary and appropriate" clause of the Coast Guard's authorizing statute: "For the purpose of executing the duties and functions of the Coast Guard the Secretary may within the limits of appropriations . . . do any and all things necessary to carry out the purposes of this title."
14 U.S.C. § 501(h).

This argument lacks merit. First, "[t]he very function of the courts is to apply statutes and necessarily to interpret and explain them." *Texas State Com'n for the Blind v. United States*, 796 F.2d 400, 417 (Fed. Cir. 1986). Second, "a 'necessary or appropriate' provision in an agency's authorizing statute does not necessarily empower the agency to pursue rulemaking that is not otherwise authorized." *New York Stock Exch. LLC v. Sec. & Exch. Comm'n*, 962 F.3d 541, 556 (D.C. Cir. 2020); *see also Michigan v. E.P.A.*, 576 U.S. 743, 752 (2015) (explaining that an "appropriate and necessary" clause is not a blank check for agency action).

The United States also cites *Murphy v. United States*, 993 F.2d 871, 873 (Fed. Cir. 1993) ("We have emphasized that judicial review is only appropriate where the Secretary's discretion is limited, and Congress has established 'tests and standards' against which the court can measure his conduct.") and *Allphin v. United States*, 758 F.3d 1336, 1341 (Fed. Cir. 2014). (Def.'s Mot. at 13–14). That quote from *Murphy* lacks context and refers to whether courts should reweigh the evidence presented to a military corrections board. It does not impose a limit on this Court's role as arbiter and interpreter of federal statutes. *Marbury v. Madison*, 1 Cranch 137, 177, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of [the courts] to say what the law is."); *see also Martin v. Creasy*, 360 U.S. 219, 228 (1959) (Douglas, J. dissenting) (Federal courts have a "responsibility in cases properly before them under heads of jurisdiction prescribed by Congress to construe federal statutes and the Federal Constitution."); 28 U.S.C. § 1491 (The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon . . . any Act of Congress . . . .").

Likewise, *Allphin* does not support the United States' argument. *Allphin* involved a similar factual scenario, where Navy servicemembers were separated using Enlisted Retention Boards. 758 F.3d 1336. However, those Boards were constituted by the Secretary of the Navy under 10 U.S.C. § 1169. *Allphin*, 758 F.3d at 1340–41. That statute is much simpler and broader than the one at issue in this case. That section provides:

> No regular enlisted member of an armed force may be discharged before his term of service expires, except--
>
> **(1)** as prescribed by the Secretary concerned;
>
> **(2)** by sentence of a general or special court martial; or
>
> **(3)** as otherwise provided by law.

10 U.S.C § 1169. The Navy used this statute to separate approximately 3,000 sailors from positions that were "overmanned" due to "record high retention in the [2011] economic environment." *Allphin*, 758 F.3d 1340. Positions that were not overmanned were published, and sailors were permitted to apply "as a contingency in case they were selected to be discharged." *Id*. The Federal Circuit held that the Enlisted Retention Boards were properly constituted under

§ 1169, and merits review of the separations was a nonjusticiable personnel decision committed to the discretion of the Navy. *Id*. at 1341–43. Those holdings do not apply to this case, and *Allphin* did not grapple with 14 U.S.C. § 357 nor did it mention a "reduction in force." Therefore, *Allphin* is inapplicable and does not support the United States' urged construction of § 357(j).

It is the Court's role to interpret § 357, if possible, using the plain language of the statute. As stated above, a "reduction in force" involves the elimination of positions or jobs and not merely the separation of personnel. Those words in § 357(j) are plain and unambiguous, and the Court assigns a definition that has been embraced by numerous federal appellate courts. In making this determination, the Court offers no opinion regarding the Coast Guard's policy objectives in shaping its force. That is a matter fittingly within the expertise of the Commandant and the Secretary.

> B. *Even if the Court were to find that 14 U.S.C. § 357(j) is ambiguous, the Coast Guard has not offered an interpretation of the statute that is entitled to* Chevron *deference.*

As explained above, the phrase "reduction in force" is unambiguous and the Court affords those words their plain and ordinary meaning—the same meaning ascribed to them by the Federal Circuit and other U.S. Courts of Appeals. However, in finding § 357(j) unambiguous, the Court has sidestepped what is known as "*Chevron* step-zero"—that is, whether the Court would even need to conduct the full two-step *Chevron* analysis or whether the Court should proceed directly to an interpretation of the statute.

Plaintiffs argue that the Coast Guard described the CRSPs as a "reduction in force" only when the legality of the involuntary retirements was challenged. (Pls.' Mot. at 16–17). Plaintiffs continue that Congress did not authorize the Secretary to define "reduction in force," but even if Congress did, the Secretary never attempted to interpret that phrase in a manner that warrants *Chevron* deference. (Pls.' Reply at 2–3). The United States argues that Congress did authorize the Secretary to define "reduction in force" and the Secretary did so through the CRSP authorization memoranda, which warrant *Chevron* deference. (Def.'s Reply at 2–7, ECF No. 70). The Court agrees with the Plaintiffs on two fronts: (1) the Secretary did not interpret "reduction in force" using the tools that would afford that interpretation *Chevron* deference; and (2) the United States' litigating position is not entitled to *Chevron* deference.

In *Chevron*, the Supreme Court acknowledged that, upon judicial review, courts might find the record devoid of the agency's administrative interpretation of the statute at issue. *Chevron*, 467 U.S. at 843 ("If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, *as would be necessary in the absence of an administrative interpretation*.") (emphasis added). In *United States v. Mead Corp.*, the Supreme Court fleshed out that acknowledgment, holding that:

> [A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the

agency interpretation claiming deference was promulgated in the exercise of
that authority.

*Mead*, 533 U.S. 218, 226–27 (2001). "Delegation of such authority may be shown in a variety of ways," the Supreme Court explained, such "as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." *Id*. at 227. Thus, *Mead* provided a "safe-harbor" of *Chevron* deference for agency interpretations conducted through formal rulemaking or adjudication, as well as informal notice-and-comment rulemaking. *Id*.

But sometimes informal agency actions are entitled to *Chevron* deference. *Id*. at 219 ("[A]gencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they may influence courts facing questions the agencies have already answered."). The *Mead* court, quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), clarified that instances in which courts should defer to informal agency action are context specific. *Mead*, 533 U.S. at 219 ("The weight of such a judgment in a particular case will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.") (internal quotations omitted). Thus, the instances in which courts should defer to less-formal interpretative acts remain murky. *See Barnhart v. Walton*, 535 U.S. 212, 222 (2002) ("[W]hether a court should give such deference depends in significant part upon the interpretive method used and the nature of the question at issue.").

The Supreme Court has recently expounded on and limited the various doctrines of agency deference. In *Kisor v. Wilkie*,[7] the court explained that lower courts "must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Kisor*, __ U.S. __, 139 S. Ct. 2400, 2416 (2019). The court clarified that, to receive deference, the "interpretation must be one actually made by the agency. In other words, it must be the agency's 'authoritative' or 'official position,' rather than any more *ad hoc* statement not reflecting the agency's views." *Id*. at 2416. Elaborating, the court recognized that "the requirement of 'authoritative' action must recognize a reality of bureaucratic life: Not everything the agency does comes from, or is even in the name of, the Secretary or his chief advisers." *Id*. at 2416. As an example, the court pointed to "'official staff memoranda' that were 'published in the Federal Register,' even though never approved by the agency head" as the type of document that should receive deference. *Id*. (quoting *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555 (1980)). However, the Court did not demarcate boundaries of administrative interpretation, but merely offered a minimum standard: "[t]he interpretation must at the least emanate from those actors, using those vehicles, understood to make authoritative policy in the relevant context. . . . If the interpretation does not do so, a court may not defer." *Id*. at 2416–17,

---

[7] In *Kisor*, the Supreme Court examined whether the character and context of an agency's interpretation of its own *regulations* entitles that interpretation to controlling weight whereas here, the agency interprets a statute. However, the Court made clear that the Chevron step-zero analysis involved an "analogous though not identical inquiry[.]" *Kisor*, 139 S. Ct. at 2416.

2421 ("Remember that a court may defer to only an agency's authoritative and considered judgments.").

Here, there is no evidence of a "considered judgment" by the Coast Guard, and the character of the memoranda establishing the CRSPs is conclusory, not interpretative. When prodded for evidence of interpretive agency analysis, the United States pointed only to the memoranda from the Commandant to the Secretary authorizing the CRSPs:

> **The Court:** What sentence can you point to—I mean, I think we're supposed to be . . . somewhat vigilant about looking for an analysis of agencies and not just agencies saying, well, this is what it is. What sentence in that paragraph provides an analysis?
>
> **[The United States]:** Your Honor, it is relatively conclusory, I'll grant you that. But there is an interpretation that under 357(j) –
>
> **The Court:** I've got that one highlighted myself. So "under Section 357(j), the Secretary of Homeland Security may authorize involuntary retirements without action by enlisted personnel boards pursuant to a reduction in force." That's a restatement of the statute, right?
>
> **[The United States]:** Well, it's—it comes in conjunction with the sentence that came two sentences before it that says the legal authority to conduct the CRSP panel derives from 357(j).
>
> **The Court:** So is that an analysis? That's just a conclusion. . . .
>
> **[The United States]:** Well, it's an interpretation.

(Tr. of Oral Arg. at 41–42). The United States has not provided the Court with any document other than the CRSP memoranda that purports to interpret the statute.

Despite the United States' urgings, the Coast Guard memoranda are not an interpretation. In *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) the Supreme Court explains that an agency does not receive deference by merely offering conclusory statements. There, the Supreme Court examined whether to apply *Chevron* deference to the Department of Labor's ("DOL") interpretation of the term "salesman" as it appeared in the Fair Labor Standards Act ("FLSA"). From 1970 to 2011, the DOL reversed course twice on whether "service advisors" qualified as "salesmen," and attempted to amend its definition accordingly. *Id*. at 2121–24. But when DOL's 2011 rule was challenged, the Supreme Court found the interpretative explanation lacking: "the [DOL] said almost nothing. It stated only that it would not treat service advisors as exempt [from the FLSA] because 'the statute does not include such positions and the Department recognizes that there are circumstances under which the requirements for the exemption would not be met.'" *Id*. at 2127. Recognizing that an agency could justify its policy choices by explaining how that policy is consistent with the statute, the Supreme Court noted that the DOL "did not analyze or explain why the statute should be interpreted" consistently with its policy choices. *Id*. In fact, the DOL "gave almost no reasons at all." *Id*. Therefore, the Court declined to

afford deference to the 2011 regulation in interpreting the FLSA, holding that "the [agency's] conclusory statements [did] not suffice to explain its decision." *Id*.

Here, like the agency in *Encino Motorcars*, the Coast Guard has not explained how § 357(j) should be interpreted to permit the policy it seeks to implement. The memoranda authorizing the CRSPs are scant, merely restating the language of the statute. The 2010 memorandum even fails to do that. (Pls.' Mot. Ex. 7 at pp. 8–9; *see also* AR 27). Each memorandum, which the Coast Guard issued annually, is approximately a page-and-a-half long and contains no legal analysis. (AR 27, 53, 86, 128). The memoranda cite the statute but provide no meaningful interpretative analysis of "reduction in force," how it has been previously understood by the Coast Guard or other agencies, how the phrases are used in other statutes, or how the phrase has been interpreted by federal courts and other adjudicative bodies in other contexts. The Administrative Record lacks any indicia of considered interpretive analysis from the Coast Guard, much less the Department of Homeland Security. Like the DOL in *Encino Motorcars*, the Coast Guard offered no explanation at all as to how involuntary separations using CRSPs were a reduction in force permitted under § 357(j). The Commandant's conclusory statements are insufficient to warrant deference.

The United States argues that the military's statutory interpretations are always afforded *Chevron* deference. (Def.'s Reply at 4–5 (citing *Favreau v. United States*, 317 F.3d 1346 (Fed. Cir. 2002) (*per curiam*) and *Small v. United States*, 158 F.3d 576 (Fed. Cir. 1998), *amended on reh'g in part,* 180 F.3d 1343 (Fed. Cir. 1999)). *Favreau* confirms that Congress has given the military "explicit authority to adopt interpretive regulations[.]" *Favreau*, 317 F.3d at 1358. That truism is not at issue here. In *Favreau*, the court examined "whether only those who request separation *voluntarily* come to the end of their enlistment" for the purposes of a bonus recoupment provision. *Id*. (emphasis added). The court was presented with a litany of record evidence interpreting the relevant statute, including military regulations, directives and official orders, memoranda relating to bonus recoupment, the agency's financial regulations, and examples of actual agency practice, "all knit together by the affidavit of [a Colonel]." *Id*. The court explicitly stated that it was relying on the entire package to discern the agency's interpretation of the statute. *Id*. ("It is only by considering this package that one could discern the relevant unifying interpretation[.]"). *Favreau* provides useful background for how the military might lawfully interpret a statute, but it does not support the United States' position here where the Coast Guard did not analyze the statute.

Seeking further support for its automatic deference argument, the United States cites *Small v. United States*, 158 F.3d 576 (Fed. Cir. 1998), *amended on reh'g in part,* 180 F.3d 1343 (Fed. Cir. 1999). *Small* was decided by the Federal Circuit more than two years before the Supreme Court issued its decision in *Mead*, and contains no discussion of the *Chevron* step-zero issues *Mead* highlighted. Furthermore, *Small* does not analyze the question presented in this case—that is, whether the Coast Guard offered an interpretation of the statute at issue.

The United States catalogs several cases from the Court of Federal Claims, which it believes support its automatic deference argument. (Def.'s Reply at 5). However, the cases cited do not involve *Chevron* step-zero analysis, and/or the military's interpretative process is far more extensive than the Coast Guard's conclusory memoranda in this case. *Martin v. United States*, 133 Fed. Cl. 248 (2017) (*Chevron* deference warranted where term at issue was explicitly

defined by three Department of Defense documents); *Towne v. United States*, 106 Fed. Cl. 704 (2012) (the term at issue was explicitly defined by statute *and* by internal DoD memorandum; *Chevron* deference awarded); *Miller v. United States*, 58 Fed. Cl. 540 (2003) (finding the statute was unambiguous and supported the United States' interpretation, but even if ambiguous, *Chevron* deference was warranted where DoD issued a memorandum explaining DoD's construction of the statute). In any event, these cases do not bind this Court. *W. Coast Gen. Corp. v. Dalton*, 39 F.3d 312, 315 (Fed. Cir. 1994) ("Court of Federal Claims decisions, while persuasive, do not set binding precedent for separate and distinct cases in that court.").

Here, the Court is left with only the Commandant's short, conclusory memoranda authorizing the CRSPs. Because the Commandant's memoranda are devoid of any analysis suggesting they represent the Coast Guard's "authoritative and considered judgments," the Court does not owe those memoranda *Chevron* deference. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (listing situations in which deference is unwarranted, including "when there is reason to suspect that the agency's interpretation *does not reflect the agency's fair and considered judgment* on the matter in question . . . when the agency's interpretation conflicts with a prior interpretation, . . . or *when it appears that the interpretation is nothing more than a convenient litigating position* . . . or *a post hoc rationalization advanced by an agency seeking to defend past agency action against attack*[.]") (cleaned up) (emphasis added). Likewise, the Court does not owe deference to the definition of "reduction in force" that the United States advances for the first time in its briefs, as that definition appears to be merely a convenient litigation position.

Therefore, even if § 357(j) were ambiguous, the Court would be required to "impose its own construction on the statute" because the Coast Guard failed to offer an interpretation that warrants deference. *Chevron*, 467 U.S. at 843. The Court completed that task in Section II(A) above, determining that "reduction in force" means the elimination of positions or jobs, not merely separation of personnel. That analysis is supported by substantial case law and need not be repeated.

*C. Plaintiffs' Motion to Strike is denied.*

Finally, as noted above (*supra* n.6), the United States attached an affidavit of a Coast Guard official to its Motion for Summary Judgment. (DA 61–63). In that affidavit, Captain Calhoun addressed emails discussing the CRSPs that were included in the Administrative Record and Plaintiffs' Exhibits. Plaintiffs now move to strike Capt. Calhoun's declaration. (Pls.' Reply at 15). Capt. Calhoun's past and present statements merely indicate that the Coast Guard's current legal strategy differs from its then-offered communication strategy. The Court does not rely on the truth of either Capt. Calhoun's past or present statements for its own legal analysis in this Opinion. In any event, the Court's decision on the merits renders the issue moot. Therefore, Plaintiffs' Motion to Strike is denied.

### III. Conclusion

The phrase "reduction in force" within 14 U.S.C. § 357(j) is unambiguous. A reduction in force involves the elimination of positions or jobs, not merely separation of personnel. But even if that phrase were ambiguous, the Court would define it as stated, and would not be required to

15

defer to any Coast Guard definition as the Coast Guard did not interpret the statute in a manner that would entitle its interpretation to *Chevron* deference. Finally, the Court need not address whether to strike Captain Calhoun's affidavit because that issue is mooted by a decision on the merits that does not rely on Capt. Calhoun for its legal analysis.

In summary:

(1) Plaintiffs' Motion for Summary Judgment (ECF No. 62), is **GRANTED**. The clerk is directed to enter judgment accordingly.

(2) Plaintiffs' Motion to Strike is **DENIED AS MOOT**.

(3) The United States' Cross-Motion for Summary Judgment (ECF No. 67), is **DENIED**.

(4) On or before July 20, 2021, the parties shall file a joint status report proposing appropriate next steps consistent with this Opinion, including remedies, and a schedule for post-judgment proceedings should they be necessary.

**IT IS SO ORDERED.**



s/     David A. Tapp
DAVID A. TAPP, Judge